And the next case for argument is 17-6206, MTI v. Employers Insurance Company. Thank you and thank you for your gentlemanly appearance. We're ready to hear you. Yes. If it pleases the court, my name is Tom Cordell. I represent Midwest Towers in this matter. We now come to the interesting part of the morning, interpretation of exclusions in a CGL policy. Midwest Towers was requested by Western Farmers Electric Cooperative to perform repairs upon a cooling tower. Only they were requested to prepare to perform these repairs on particular parts of the cooling tower. A cooling tower, and if I might digress and just go and give a little explanation on a cooling tower. Well, let's go to the policy first. The policy that your client had purchased. Was a CGL policy. Commercial General Liability Policy. Is that relevant, the fact that it's a Commercial General Liability Policy, do you think? Yes. It's because the exclusions that are included in that CGL policy are the J5 and J6 exclusions, and they exclude property damage to that particular part of either the real property or the property upon which they insured in this case. In other words, there is coverage except for this exclusion. That's correct. And the language of the exclusion was what? The language of the two exclusions, J5 and J6, provided that there is no coverage for property damage to that particular part. Arises out of those operations. Which arises out of those operations upon which he is performing the work. That's correct. Now, that's J5, and it applies to real property. J6 applies to property, and it says that there's no coverage for property damage to that property upon which the insured is performing improper or incorrect. What is the distinction between property and real property for our purposes? For your purposes, it may not make any difference because the real property, if you determine that the bolts that were being removed and being replaced, the anchor bolts in this case, are part of the real property, then so be it. Or if you consider them to be personal property or property that is not real property, so be it. The key to this case, the essence of this case, or as E.E. Cummins would say, the root of the root, the bud of the bud, the sky of the sky. The essence, essential issue here is when is a part the whole? We get to that because the language is that particular part was interpreted by the court to mean the whole. That when Midwest Towers was performing work on removing and replacing these anchor bolts, the court interpreted that to be working on the entirety of the tower. Now, a cooling tower contains numerous component parts, a water system, a piping system, a pump system. The trial court, I forget the name of the case, but compared this to the case in which you were talking about, there was work being done on the foundation and the court said in that case, the appellate court determined that the foundation had to be a part of the whole because it becomes almost the sine qua non of the property itself. Yes. There were two cases. What's the name of the case? Well, the case that the district court, the Western District, had decided prior to this case was the Essex Insurance Company versus Shepard and Son case. In that case, there was a situation where the contractor had used fill underneath the foundation and had improperly installed that fill. As a result, the foundation shifted and there was damage to the entirety of the building. In that case, the judge, a different case in the district court, found a completely different result. In that case, the court looked to other cases, the Sixth Circuit case, in which the court said the phrase that particular part is trebly restrictive. It strains language to the point of almost awkwardness, the court said, to make the point that that particular part is limited to the part upon which the insured is working at the time the damage occurs and does not encompass the entirety of the building. Now, that position is a position that we believe is accurate because when you look at the interpretation of simply the language that is used here, that particular part, particular, the root of particular, is part. It seemed to me that the district court opinion was very well done. My question to you is where did the district court go wrong and what's the best case you have for the proposition that the district court's selection of cases went astray? Two points there. All right. The first point is the language of the exclusion itself. In order to determine how the exclusion is to be applied, you have to look at the exclusion. In this case, when you look at that phrase, that particular part, it is very trebly restrictive and does tell us that the part is not the whole. In that case, when you just look at the language itself, then you must determine that particular part does not mean the whole. Secondly, if you look at the exclusionary language, when interpreting the exclusionary language, courts are to use their interpretive powers as a scalpel and to carve away very carefully and narrowly and precisely only that part of coverage to which the language of the exclusion applies. Here, the language of the exclusion says that particular part. The language of the exclusion does not say the entirety. If they wanted to rewrite the policy provision and say, yes, we want it to apply to all property that may be resulting in damages from the insurer's work, they could have said that. But they didn't say that. They said property damage is excluded, only that property damage that is a particular part that they are working upon is excluded. Thirdly, when you look at the exclusionary language, the court is not to use its interpretive powers as a sword and to cut with broad swaths portions of coverage to which the exclusion does not apply. Now, that is what the court did in this case. And the court did it under the business risk doctrine. And this court has told us, at least in the Greystone case and other cases, that the business risk doctrine is not to be an exclusion itself. The exclusion defines the scope of the business risk that is excluded, not the other way around. But there have been courts, and the cases are sided by the opposition in this case. For example, the West Side case, which is a recent Seventh Circuit case. And in that case, they did decide that a hot grain bin was exploded as a result of the insured working upon a part of that. And they said that the exclusion encompassed the entirety of the whole, but did so under the court's belief that the business risk doctrine encompassed the entirety rather than the particular part. What is your best case? What is it that supports your proposition? We have. If you had to pick one case. I would pick, well, I'd probably pick three cases. I'd pick the Fortney case out of the Sixth Circuit. I'd pick the mid-continent. So Judge Lucero said, give me your very best purple cow close to my case. You'd say, I have 16 cases. So how about one case? The Fortney case. Fortney? Fortney case. All right, and tell us about Fortney. What happened in Fortney, and why is it analogous to this case? The Fortney case was a case that involved, I believe, another situation where there was improper construction of the foundation of the building. And this individual was the contractor. And his contract was to build the entire building, but the improper work was performed on the foundation. And that work on the foundation resulted in damages to the entire building. And in that case, the court looked at it, because the lower court had said, I believe, that that exclusion encompassed the entirety of the damage to the building. Because the foundation was connected to the walls, the walls were connected to the roof, and therefore they said it was work on the entirety of the building. The Sixth Circuit said no, and that is the language where the court said that particular part, phraseology, is trebly restrictive, and it strains to the point of awkwardness again, the point that this is limited only to that particular part that the insured is working upon. The best example I have, as you can see, I've got a little unusual footwear that I'm wearing, and that's because I had a ladder accident where I fell off the ladder, fractured my ankle, and dislocated it. When I went to the surgeon, he didn't look at my body and say, you fractured your whole body. He says the hip bone's connected to the... Yeah, the hip bone's connected to the ankle bone, but the fact that one part is connected to the other part did not mean that he went in and repaired my entire body. He repaired and fixed the fracture to the ankle, and he did not tell me, or no one told me, that a fracture of one part of my body was a fracture of the entirety of my body. We understand the... So you wanted to tell us about two more cases, and I cut you off to limit you. That's okay. Give me the other two cases that best support your position. Yes. The other two cases would be the Mid-Continent v. JPL case, and in that case, they were dealing with waterproofing that was installed on the house, and the waterproofing leaked and caused damages to a good part of the rest of the property. And in that case, they said that particular part of the property that he was working on was not the entirety of the home. He was working only upon the waterproofing, and this exclusion applies only to that particular part of the property that he is working upon. Therefore, the cost of replacing the waterproofing is covered, but the cost of replacing and repairing the other parts of the house, the sheetrock, the subflooring, those type of materials were not encompassed within the scope of this exclusion. This exclusion is limited only to that particular part of the property upon which the insured is performing work. That court would not use the business risk doctrine as a sword and cut away more of the coverage than the exclusion tells them to cut away. You've given us a description of what it's not. Would you give us another description of what the particular part is in this case? Yes, the particular part in this case. Is it if they broke a bolt, and that's it? No. In this case, the worker for Midwest Towers came out and removed all of the anchor bolts around the cooling tower, and he did that improperly. What he should have done is taken out a bolt, replaced the bolt, and done so on down the line, but he didn't do it. He took out all of the bolts, and that was the work that Midwest Towers was contracted to do, and what they were paid to do, and the policy provides that particular work that you are performing is excluded, so it would be the removal and replacement of all of the anchor bolts that they had been requested to do and perform on behalf of Western farmers. And would that include support structure that would be affected, make it safe to perform that work? In our opinion, no, because, again, it's the old dem bones analogy of the ankle bone connected to the hip bone and so on and so forth. The fact that they are interconnected does not mean that the work that is being performed is on that particular part of the cooling tower. So basically you're saying that damage to the bolts themselves is the only thing that's excluded under this policy, under this exclusion? Property damage to that particular part, yes. That would be the bolts that they were to take out and replace. So it would be all of that work on the bolt structures that they were performing. The bolt structures or just the bolts themselves? Well, when I said the bolt structure, I meant the process of taking out the bolts and putting back in the bolts. That was the process that they were working on. That is a particular part of the work that they were doing, removal and replacement of the bolts. That cost approximately $46,000 under the agreement that they had. There was a little bit of other work on some of the louvers, but approximately $46,000 for that work, and that would be excluded under the coverage, under the policy provision. And that is the language that you have to use. Counsel? Yes. I have a related question. Yes. You just alluded to it. Looking at the scope of work documents in the record, there is, in addition to installing anchor castings, also removing existing louvers. And my question is whether the scope of the work, the understanding between the parties as to the scope of the work, is relevant to how we should apply these exclusions. And you're saying, well, the tower is divisible and we can just look at the base where the bolts were taken out, but the scope of the work kind of went beyond the base, didn't it? And why isn't that some evidence that even under a narrow interpretation of the exclusions, it still encompasses the whole tower? The scope of the work is important because... Is it relevant to how to apply the exclusions? Yes. And it is because the scope of the work goes back to that particular part of the property that they are working upon. The scope of the work defines that particular part of the property that Midwest Towers was working upon. Well, let me just... Just to be clear, let's say that the scope of the work involved would work on three different parts of the tower, but they'd only done work on one part. Would the exclusion only apply to the work that actually was done, or would it apply to all the work that had been contracted to be done? No. It would only apply to the work that is being performed at the time that the damage occurs. And that's what this exclusionary language says, that it has to be that particular part of the property that is being worked upon at the time that the incident occurs. So in this case, to say that Midwest Towers, when they were working on the anchor bolts... Thank you. Thank you, Counselor. If you'll notice, you've got a minute and a half over. Thank you. All good things come to an end. Good morning. May it please the Court. Jeffrey Garish on behalf of Employers Insurance Company of Warsaw. I want to start by pointing out that whether you focus on the purpose of these exclusions, on their plain language, or on the case law involving analogous situations, the District Court got it right. Judge Lucero, I couldn't agree more. The judge's opinion is excellent. We cited a number of reasons in our brief on top of those, but I want to start with the purpose of these exclusions. Could I just ask kind of a general question? Both sides cite a lot of cases in your briefs, a lot of out-of-Oklahoma cases. Is this issue sort of up for grabs in Oklahoma? In other words, is there any settled Oklahoma law on this issue? There's no case on point in Oklahoma, for sure. But we've argued that Oklahoma's pronouncements on insurance coverage principles govern the outcome of this case. And that brings me to the purpose of these exclusions, which is these exclusions are intended to exclude property damage that directly or consequentially occurs from the faulty workmanship of the insured while the work is ongoing. Where did you get that consequentially language? I read that from Advantage Home Builders, which is this Court's case. And Judge McKay was on the panel. And the Court also recognized the purpose of CGL policies, to your point, Judge Lucero, is not to provide coverage in the nature of a performance bond. They're not to warranty the insured's work. The reason I begin there is because you'd be hard-pressed to find a better example of an insured trying to convert a CGL into a performance bond. They're asking us to pay to repair their work. That's what they're asking. And to go back to your point about Oklahoma. Well, a performance bond's a little different, though, isn't it? I mean, if I'm going to put a roof on a building and I want to make sure that the roof doesn't leak for 20 years, I'm going to get a performance bond to make sure that that roof is built according to specifications of the manufacturers, et cetera, et cetera. Roof leaks, I've got a performance bond. Now, that's not the performance. This doesn't involve warranty of the performance of the work. Doesn't this involve a purer question of the scope of coverage that you folks provide and what it is precisely that you exclude from coverage? Correct. You're right. It's not technically being converted into a performance bond. And I'm going to get to the language, but I want to finish answering Judge Matheson's question because I'm going to read from the Oklahoma case that I think is most helpful. This is from the Oklahoma Supreme Court in Dodson where they were interpreting another business risk exclusion. Not these exclusions, but it was a your work exclusion and a CGL policy. And that court said, they said that it applied to preclude coverage. And the court said, now I'm quoting, to hold otherwise would effectively convert the policy into a performance bond or guarantee of contractual performance and result in coverage for the repair and replacement of the insurer's own faulty workmanship. That pronouncement from the Oklahoma Supreme Court makes it clear, I think, that they would fall on the side of not construing this language to basically pay for their own faulty workmanship. Turning to the language itself, there's two exclusions, J5. Could I just, as long as we're on that case, this is the case you rely upon for your business risk argument? It's one of them. Well, it's the Oklahoma one. That's true. All right. I need a little help on what you mean in this context by business risk. How does that work given our circumstances here? The business risk, what's been called the business risk exclusions, are exclusions that essentially provide that the CGL policy doesn't insure their own workmanship. It's not going to pay for repairing their own work. That's a business risk that they assume. They can't foist the cost of repairing their own faulty work on the insurance carrier, a CGL carrier. And there are several exclusions that fall within what are called the business risk exclusions. I think the one in Dodson, it wasn't these exclusions, I'll grant. I think it was the your work exclusion, which is something with the effect of once you're gone, once you're done with the project, we will not cover damage to your work itself. That doesn't apply here because they were still there. They were still performing operations. But these J5 and J6, they're called business risk exclusions as a way of describing their purpose. But even if you focus on the plain language, it's clear that they apply. And if I start with J5, did I answer your question, Judge? No, I think going on to the exclusions is good. Yeah, J5 precludes coverage of damage to property of that particular part of real property on which you are performing operations. Now, their entire argument is to say that the phrase that particular part always in every case requires the exclusion to be limited to the area that they're physically touching. That's essentially what they're saying. But there's nothing in the language that says that. And this is where the district judge's analysis was spot on. The judge recognized that the nature of the work sometimes means that performing operations contemplates that the operations may encompass areas that they're not actually physically touching. And the one case that we gave, one of the best cases we've cited, Judge Lucero, is the Westside salvage case. That's a Seventh Circuit case involving the hot grain bin. And they were trying to reduce the temperature of the grain inside a bin. They screwed it up, and the bin exploded. And the insured said, Aha, you weren't working on the bin itself, you were working on the grain. And the Seventh Circuit said, Nonsense. They're performing operations on this grain bin with the grain inside it. The fact that they're not working literally touching the grain bin itself is neither here nor there. Our case, to me, is an even better example. Was that case correctly decided, do you think? Yes. Well, yeah, that's one of the cases. And that case, by the way, came out after our district judge opinion. It came out in December where they said, Depending on the nature of the work, you don't have to literally be physically working on the part that is damaged. Because performing operations, and there's nothing in the policy that requires that you physically be touching that part. All right, so I take my laptop to the workshop that's covered under this policy, and I ask the shop to repair a certain aspect of the innards of the laptop. And the shop works on it, but they screw it up. And when I start using the laptop, it destroys the entire computer operation of the test circuit, let's say. Right. And so in that case, at what point does operations and property have any meaning? Yeah, I think in that case, the damage would be covered. I don't think this exclusion would apply to that, because the phrase, that particular part, that is intended to preserve coverage of fortuity, something that's unexpected and fortuitous. For example, in our case, there are three towers that are all part of the same facility. If in failing to brace the one tower that they're working on, it tipped over and fell into one and damaged the other one, I think the damage to the other one would probably be covered. But given the nature of their work, their work is on the tower itself. To say that they're working only on the bolts, and only the bolts would be excluded, has it exactly backwards. Judge McKay, your question was pretty profound, I thought. And they said in their brief, the only thing that this- I only sniff flattery, I don't drink it. I'm sorry. But I think it's a good point. And they say in their brief, this exclusion applies for damage to the bolts. No, it doesn't, because the damage to the bolts wasn't incorrectly performed. The bolts were correctly removed. There wasn't incorrect work on that. The only incorrectly performed work was the failure to brace the tower. That's the nature of the work. And the judge recognized, given the nature of the work, when the tower tipped, they were performing operations on the tower. And let me go to exclusion J6, because this one is at least as clear, maybe clearer. Let me ask another question. Reflect yourself back to law school. Remember those old seriatim decisions at the common law, where you'd have three members of the appellate court, and one would say, here's my analysis, and the second judge would say, yeah, I agree with my brother McKay, and here's why. And then the third judge would say, no, I'm sorry, I can't agree with my colleagues, because he set forth, in those days, his rationale. So now you'd have three views. And in that case, and I'm going now to the issue of ambiguity, you had disagreement among reasonable folks, reasonable jurists. In this case, we've got cases all over the board. Some come really close. Others come even maybe closer. Does the fact of disagreement among the appellate courts, the reasonable jurists, does the fact of the disagreement among the various authorities that we have to resolve play into the question of whether this language is ambiguous was such that we should resort to statutes, rules of construction? It doesn't for, I think, three reasons. Number one, the fact that, let's assume, arguendo, there's a split of authority on the question presented in this case. That would mean that half the courts found no ambiguity, and half the courts found that it was covered or there wasn't ambiguity. The fact of the split doesn't mean that all the courts finding no ambiguity are wrong. The split of authority, I understand there are some courts that have adopted it. It's never made much sense to me because it's a one-way ratchet. You're not having courts say, we think the insurers have the better interpretation. They're saying there's no ambiguity, and we're saying they're right. The second point, though, is if you look at Oklahoma's law on this, I don't think Oklahoma has ever adopted that principle, that a split of authority creates an ambiguity. But what Oklahoma law does say, and now I'm quoting again from Dotson, neither forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a favorable construction. So under Oklahoma law, it's stronger in my defense on that. But the third point might be the best. And that is there isn't a split of authority on this issue. The split of authority involves what I've called in my brief cases with isolable portions of divisible projects. You've got a house where they're working on one room, and it can be easily divided. This case isn't an isolable portion of a divisible project. Their task was to brace the structure. That was the whole task. It's not as though they were only working on a part of the structure. They were working on the whole structure by trying to brace it. All the cases, to my mind, That may be your best argument. You're saying the scope of the project wasn't to repair bolts, but it was to rectify structural issues with the tower caused by the bolts. Exactly. And if you change the facts a little bit, That is a fact question, though, isn't it? What they were hired to do? No, they were hired to maintain the tower, and that included stabilizing it. There's no question on that. Is there? What would you point to in the documents that support that position? Rather than just saying it. I'd like to see in the documents where the arrangements were made for this work that stabilizing the tower was the project. I'm not going to come up with it right now standing here. I think I've addressed it in my brief. That's the best I can do. Well, how about the language itself? It supports Judge Mathis's question, the thrust of his question. It says, unit one, install new bolts throughout the entire basin. Right. What was basin? That's the place where the bolts are installed. But their duty was to maintain the tower as a whole. Yeah, but that isn't what that says. Well, that was part of it. Well, then what's the rest of it? I mean, this is important for your case. Well, their task with changing the bolts was to stabilize the tower. I mean, I know I'm putting you on the spot, but it would be nice if there were a document that just said that. I mean, I would just refer the court to my brief. Well, we'll look at it, and we'll look at the record. If I can just make one more quick point. Sure. We cited five cases from Westside Salvage where insurers were tasked with raising houses, and in those cases the courts always recognized that you're working on the house as a whole when you're raising it. Whether you're raising it or stabilizing it, you're working on the structure as a whole. Thank you, Your Honor. Did the parties or the court ever discuss certifying the case? Oklahoma doesn't like to have certification much, but did you consider it? I mean, obviously, I'd have to consult my client. I'm sorry, Your Honor, I don't know. No, the motion to send the judgment was filed when this case was filed by Boston. There was no request to certify that. By either side. Certify the question. All right. Thank you. Thank you, Your Honor. Thank you, counsel. Very well presented. Was counsel's time up? Yes. The case is very well presented by both of you. I compliment you. I'm sure the panel joins me in that. We'll take a brief recess and presume with the final case.